# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

BEREATHA KYLE-EILAND,

        **Plaintiff,**                             **Case No. 2:07-cv-750**
                                                   **JUDGE GREGORY L. FROST**
    **v.**                                       **Magistrate Judge Mark R. Abel**

ALBERT NEFF, et al.,

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of the following filings: a motion for summary judgment (Doc. # 67) filed by Defendants Albert Neff, Ann Salimbene, Lorena Weber, and Marcie Naber; a memorandum in opposition (Doc. # 68) that incorporates an earlier memorandum in opposition (Doc. # 48), both filed by Plaintiff, Bereatha Kyle-Eiland; and a reply memorandum (Doc. # 70) filed by Defendants. For the reasons that follow, the Court finds the motion for summary judgment well taken.

## I. Background

Beginning in November 1989, Plaintiff, Bereatha Kyle-Eiland, an African-American female, began working for The Ohio State University ("OSU"). Plaintiff worked for the university for roughly twelve years without apparent incident. During this time she held several positions with OSU including: Account Clerk, receptionist, Clerical Specialist, Personnel Aide, Personnel Technician, Human Resource Associate, and Administrative Associate 1.

In 2001, Plaintiff accepted a position as an Administrative Associate 1 in the College of Nursing. In the fall of 2004, an employee of OSU, Margaret Eader, working under Plaintiff

1

retired. Plaintiff subsequently assumed a portion of Eader's duties. The parties disagree about whether Plaintiff voluntarily assumed these duties or whether Plaintiff's supervisor had instructed her to do so. In any event, Defendants allege that Plaintiff's performance began to decline in the summer of 2005, noting that she failed to turn reports in on time.

In the fall of 2005, Plaintiff had discussions with her supervisor, Ann Salimbene, about hiring a replacement for Eader. During this time period, Salimbene had instructed Plaintiff that she should keep a log of the hours Plaintiff spent on each task throughout the workday. Salimbene stated that even though she had instructed Plaintiff to keep a log, Plaintiff never completed one or turned one in. Plaintiff allegedly believed the log as well as the level the "replacement" position was to be posted at demonstrated an intent to have the new hire replace her. Plaintiff also allegedly believed that Salimbene was treating her unfairly in trying to retain oversight over whom Plaintiff hired. Plaintiff sought sole authority on what candidate would eventually be selected while Salimbene wanted to retain some input. In response to the delays, Salimbene issued direct instructions to Plaintiff to post the job opening. Plaintiff never posted the position, however, despite the direct instruction to do so. Accordingly, on November 21, 2005, Salimbene issued Plaintiff a written reprimand for failing to follow instructions to post the position.

Plaintiff contacted OSU's Office of Human Resources after receiving the reprimand. On December 12, 2005, after speaking to an Employee and Labor Relations Consultant there, Plaintiff filed a charge with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"). This charge alleged discrimination on the basis of race. Plaintiff received a right to sue letter for this charge on September 11, 2006. She

alleges that similarly situated Caucasian employees could hire assistants without any input from their supervisors. Plaintiff also alleges that she was replaced by a Caucasian male who earned $58,692 while her salary was only $53,460.

On January 30, 2006, Plaintiff tendered her resignation from the College of Nursing and accepted a position as an Administrative Associate 2 with the College of Education and Human Ecology. As a result of alleged occurrences at the College of Nursing, Plaintiff filed a May 25, 2006 charge of discrimination with the OCRC for forced resignation, harassment, demotion, and hostile work environment. Plaintiff later filed a second charge related to these events. An audit performed after Plaintiff had left the College of Nursing purportedly revealed serious errors in Human Resources that Plaintiff should have caught and corrected, specifically, alleged deficiencies by Plaintiff that directly caused overpayment to ex-employees in the amount of $4,138.

Several incidents occurred while Plaintiff was employed with the College of Education and Human Ecology. She began working for the College of Education and Human Ecology on February 15, 2006. Part of Plaintiff's duties was to split her time between the college and the Center for Learning Excellence ("CLEX"). Her supervisor at CLEX was Defendant Albert Neff. According to Neff, Plaintiff's primary role while at CLEX was to prepare monthly pivot reports for CLEX and four projects under its supervision. Neff asserts that at first, Plaintiff failed to provide reports for three of the four projects. Neff states that the reports that were filed did not approach what Neff needed to manage CLEX effectively.

Plaintiff asserts that prior to August 2006, she was unaware that Neff was her supervisor. She contends that she believed that she was only under Neff's functional supervision. In August

2006, however, Plaintiff was informed that she was under the supervision of Neff. Neff discussed placing Plaintiff on a performance improvement plan with Defendant Lorena Weber, the Administrative Manager for the College of Education and Human Ecology. Neff and Weber contacted Plaintiff to discuss the performance improvement plan in August 2006, but Plaintiff then went on medical leave. It was not until November, 9, 2006, that Neff and Weber reviewed the performance improvement plan with Plaintiff. Neff and Weber both assert that at the time they placed Plaintiff on the plan, they were unaware that Plaintiff had filed a charge previously. Nevertheless, Plaintiff filed a charge with the OCRC alleging retaliation. Plaintiff received a right to sue letter for this charge on February 14, 2008.

Plaintiff asserts that she had not had any prior discussions about her duties or the expectations others had of her. In December 2006, Neff and Weber conducted a follow-up meeting with Plaintiff regarding the performance improvement plan. Neff asserts that even though Plaintiff was placed on a performance improvement plan, her performance had not improved. As a result of the follow-up meeting, another employee at OSU, Christina Fultz, was required to train Plaintiff to produce the reports as requested by Neff. Fultz previously held Plaintiff's job and as such was familiar with the reports. Plaintiff claims she produced the reports to Neff as requested and trained.

Another incident arose regarding a meeting Plaintiff had scheduled with Don Seidelmann, a Resource Management Analyst at OSU working in the Office of Finance. Plaintiff asserts that the meeting with Seidelmann was scheduled to learn about financial reports and deficit problems experienced by CLEX. Plaintiff further asserts that Neff canceled the meeting, but Neff insists that he was not the one who canceled the meeting, but only informed

Plaintiff of the cancellation.  Defendants assert that Seidelmann, in an effort to prevent duplication of work, looked into the matter and, based on the information he had received, canceled the meeting.  Defendants also assert that it was inappropriate for Plaintiff to seek assistance from Seidelmann because he worked outside the College of Education and Human Ecology.  On January 18, 2007, Plaintiff filed a charge with the OCRC alleging that she was being retaliated against.  Plaintiff received a right to sue letter for this charge on June 16, 2008. On February 8, 2007, Plaintiff filed another charge of discrimination with the OCRC, claiming she was being retaliated against in that Defendants had canceled her meeting with Seidelmann and reduced her duties.  On June 16, 2008, Plaintiff received a right to sue letter on this charge. On May 7, 2007, Plaintiff filed yet another charge of retaliation with the OCRC, but apparently has not received a right to sue letter for this charge.

In May 2007, Neff purportedly believed that Plaintiff's performance was still unacceptable.  Neff cites the reports he insists were still deficient, as well as other problems, as the reasons why he sought to discharge Plaintiff.  The other reasons cited include Plaintiff's alleged failure to make a timely payment for cleaning services and her purported failure to develop a key control system as instructed.  On May 16, 2007, after gaining approval from Human Resources, Neff signed a letter of removal.  Plaintiff disputes the allegation that she never developed a key control system and insists that the delayed cleaning services payment was not her fault.  Plaintiff also asserts that other African-American employees at CLEX were treated similarly to Plaintiff, citing allegedly poor treatment of Sherrienreny Moore, an OSU employee who worked in the College of Education and Human Ecology.

Plaintiff originally asserted that on May 16, 2007, she went to the OCRC office in

Columbus and filed a charge based on her discharge. A sign-in sheet at the OCRC indicates that Plaintiff did in fact visit the OCRC on May 18, 2007, and Plaintiff later agreed that this is the correct date of her visit. A column on the sign-in sheet indicating the purpose of visits was left blank, however, and Plaintiff and Foday Kennah, the OCRC officer to whom Plaintiff spoke that day, disagree on the purpose of the visit. Plaintiff insists that she met with Kennah to file a charge in relation to her discharge, but Kennah asserts that Plaintiff was there to discuss the status of already pending charges and did not attempt to file a new charge. Although it is OCRC practice to provide a copy of a charge to the requesting party immediately upon filing, Plaintiff has no copy of a May 18, 2007 charge. There has apparently never been an investigation in regard to any May 18, 2007 charge, and no right to sue letter has issued.

Several other incidents warrant mention. While Plaintiff was employed with the College of Education and Human Ecology and CLEX, Plaintiff had applied for over three dozen other jobs at OSU. For example, in May 2006, Plaintiff applied for a job with the College of Engineering as an Administrative Associate 2. Plaintiff was one of sixty applicants for this position, one of five applicants who were interviewed, and one of two applicants who received a second interview. Barbara Holt, the Human Resources Director for the College of Engineering, conducted the interviews. Plaintiff passed a preliminary phone interview for the position before being chosen for a formal interview. Plaintiff's formal interview was not particularly strong according to Holt. Holt purportedly believed that Plaintiff was unaware of certain knowledge that the position required and that, based on Plaintiff's experience, Plaintiff should have known.

In conjunction with the interviewing process, Holt contacted several references for Plaintiff. Holt received what she rated as a good reference from Defendant Marcie Naber.

Naber had told Holt that she had not worked directly with Plaintiff, but the communication and interactions she had with Plaintiff on the Policy Review Committee were fine. Holt also contacted Defendant Lorena Weber as a reference. Weber asserts that she told Holt that she could not say much about Plaintiff because the two of them had not previously worked together. Holt rated this review as neutral. Holt did receive what she characterized as a bad review for Plaintiff from Kristi Pyke, one of Plaintiff's previous supervisors. One of Holt's colleagues, Tom Conger from the College of Engineering, also contacted individuals seeking references in regard to the job opening. Conger contacted Salimbene about Plaintiff, who allegedly indicated that she would not rehire Plaintiff. Salimbene also purportedly told Conger about an audit conducted after Plaintiff's resignation that had allegedly revealed deficiencies in Plaintiff's work.

Plaintiff's characterization of the events that transpired in the application process differs from that of Defendants. Plaintiff asserts that Weber had given her a bad reference as retaliation. Plaintiff also insists that Salimbene's bad reference was retaliatory. On August 12, 2006, Plaintiff filed a charge with OCRC in relation to her application to the College of Engineering. On May 9, 2007, Plaintiff received a right to sue letter for this charge.

In August 2006, Plaintiff had applied for a human resources position at the Ohio Supercomputer Center ("OSC"). Plaintiff alleges that she was interviewed by a panel for her first interview, and by OSC's CEO, George Haller, for her second interview. Plaintiff alleges that Haller had told Plaintiff that if he heard good things about her, the job was hers, but if he did not hear good things, he would repost the job at a higher classification level. Plaintiff was later informed that the job was being reposted at a higher level, but she concedes in her deposition

that Haller never informed Plaintiff that he had heard bad things about her. In response to being turned down for this job, Plaintiff filed a charge with the OCRC on September 9, 2006. Plaintiff received a right to sue letter for this charge dated October 22, 2007.

In September 2006, Plaintiff applied for an Administrative Associate 1 position with the College of Math and Physical Sciences. Roughly one hundred people applied for this position and seven people were interviewed. The Human Resource Manager for the College of Math and Physical Sciences, Defendant Marcie Naber, and the Vice Chair of the College, Professor Luis Casian, conducted the interviews. Naber was allegedly unimpressed with Plaintiff's responses to questions during the interview. After the interview, Plaintiff e-mailed Naber and stated that she believed she did not interview her best. Naber informed Plaintiff that there were better candidates for the position and indicated that Casian had made the decision to stop considering Plaintiff for the position. Naber indicated that she had talked to Weber regarding Plaintiff, but asserts that the conversation occurred after Casian's decision to stop considering Plaintiff for the position. During this conversation, Naber asserts that Weber had told her about an OCRC charge filed by Plaintiff.

Plaintiff points to this conversation as evidence of retaliation. Plaintiff claims that she filed a charge alleging retaliation in that she was not selected for thirty-eight jobs she applied for during her employment with the College of Education and Human Ecology and CLEX. One of these thirty-eight positions was the opening for Administrative Associate 1 with the College of Math and Physical Sciences. Currently, Plaintiff has presented no evidence that she filed such a charge with the OCRC.

While at the College of Nursing, Plaintiff alleges that she was yelled at by OSU

employee Lindsey Margaroli and that this was racially motivated. Plaintiff contacted the University Office of Human Resource and filed a complaint. A meeting was subsequently held, and Margaroli apologized. Plaintiff also asserts that on November 3, 2004, Elizabeth Lenz entered Plaintiff's office and began to yell at her. Plaintiff alleges that another co-worker, Michelle Compston, came over and escorted Lenz out of Plaintiff's office. Plaintiff contacted the Senior Vice President of Human Resources, Larry Lewellen, about the incident, who in turn contacted Salimbene and Lenz. Plaintiff further asserts that Salimbene required Plaintiff to perform the duties of a former subordinate who had retired. Plaintiff also maintains that, upon her transfer to CLEX, her access to human resource system processes was removed and that she was required to do routine paperwork. Plaintiff alleges that Weber was responsible for this demotion in duties.

Plaintiff filed the instant action on August 1, 2007. (Doc. # 2.) In a subsequently filed two-count amended complaint, Plaintiff asserts claims against all Defendants under 42 U.S.C. § 1983 (Count I) and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Count II). Defendants Neff, Salimbene, Weber, and Naber had previously filed a motion for summary judgment (Doc. # 35), but a dispute arose as to whether additional inquiry into the issue of exhaustion of administrative remedies was needed. The Court conducted two telephone status conferences to resolve this issue, the issue of several claims from the original complaint that Plaintiff sought to withdraw, and the issue of Defendants' failure to file depositions certified by the court reporter. (Docs. # 52, 54.) The parties agreed that Defendants would withdraw their original motion for summary judgment, that Defendants could file court reporter certifications to cure the deficient depositions already part of the record, that Plaintiff would file the amended

complaint, and that additional discovery concerning the exhaustion issue would occur before the re-filing of the motion for summary judgment presently before the Court. (Doc. # 55.) All of these events transpired, and on February 20, 2009, Defendants again moved for summary judgment. (Doc. # 67.) Briefing has concluded on that motion, which is now ripe for disposition.

## II. Discussion

### A. Standard Involved

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*,

477 U.S. at 251-52).

## B. Analysis

### 1. Section 1983 Claims

As noted, Plaintiff asserts a claim under 42 U.S.C. § 1983 for race discrimination in

violation of her Equal Protection rights.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen
> of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Thus, in order to assert a valid § 1983 claim, Plaintiff must show that, while

acting under color of state law, Defendants deprived her of a right secured by the Federal

Constitution or laws of the United States.  *See Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir.

2003).

In order to prove race discrimination under § 1983, Plaintiff must prove the same

elements that she would prove while proceeding under Title VII.  *Walker v. Ohio Dep't of

Rehab. & Corr.*, 241 F. App'x 261, 265-66 (6th Cir. 2007) (recognizing that "race discrimination

claims . . . under Title VII and . . . under 42 U.S.C. § 1983 are governed by the same substantive

standards"); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004).  Thus, to survive

summary judgment on her § 1983 race discrimination claims, Plaintiff must first present a *prima

facie* case of race discrimination by introducing evidence sufficient to support a finding that she

was a member of the protected class, that she suffered an adverse employment action, that she

was qualified either for the position lost or not gained or the promotion she was denied, and that

11

she was either replaced by someone outside the protected class or treated differently than similarly situated, non-protected employees. *Walker*, 241 F. App'x at 266 (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006))*. See also Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000). Plaintiff can prove her claim of race discrimination in two ways.

The first way is by direct evidence, which the Sixth Circuit Court of Appeals has explained " 'is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor. With direct evidence, the existence of unlawful discrimination is "patent." ' " *Weberg v. Franks*, 229 F.3d 514, 524 (6th Cir. 2000) (quoting *Bartlik v. United States Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996)). Defendants asserts that this is not a direct evidence case, and Plaintiff does not contest that argument.

The second method by which Plaintiff can prove her claim is by offering indirect or circumstantial evidence to establish the alleged race discrimination. But as noted below, Plaintiff has failed to produce even circumstantial evidence of discrimination in regard to several of her claims. Because the pretext issue proves dispositive of other aspects of Plaintiff's race discrimination claims, the Court shall assume for the sake of argument that Plaintiff has established a *prima facie* case in regard to several of the incidents about which she complains (except as noted below), and then proceed to the next phase of the requisite inquiry.

When a plaintiff has established her *prima facie* case in such circumstantial evidence cases as found here, a court must then employ the familiar *McDonnell Douglas/Burdine* burden-shifting framework. *See Hagan v. Warner/Elektra/Atlantic Corp.*, 92 F. App'x 264, 267 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). The Sixth

Circuit Court of Appeals has explained the resulting inquiry:

> If a plaintiff demonstrates a *prima facie* case of . . . race discrimination, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the challenged employment actions. [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)]; *see also Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 574 (6th Cir. 2003) (en banc) (*applying* McDonnell Douglas *analysis to age discrimination* claim); *Zambetti v. Cuyahoga Cmty. Coll.,* 314 F.3d 249, 255-56 (6th Cir. 2002) (applying *McDonnell Douglas* analysis to reverse race discrimination claim). The defendant need only produce a legitimate, non-discriminatory reason; it need not persuade the court that this reason actually motivated the employment actions in question. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Once the defendant meets its burden of producing a legitimate, non-discriminatory reason for its challenged actions, the burden shifts to the plaintiff to demonstrate that the asserted justification is mere pretext for discriminatory motives. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003). The plaintiff may meet this burden by showing that the reason offered by the defendant for the challenged employment actions (1) has no basis in fact, (2) did not actually motivate the actions, or (3) was insufficient to warrant the actions. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The burden of persuading the trier of fact that defendant's asserted justification is pretextual ultimately rests with the plaintiff. *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003).

*Koval v. Dow Jones & Co.*, 86 F. App'x 61, 66 (6th Cir. 2004) (footnote omitted). Applying this standard, this Court must agree with Defendants that Plaintiff's claims of race discrimination fail.

Defendants assert that Plaintiff either cannot demonstrate critical elements of her claims or that legitimate, non-discriminatory reasons underlie each of the events about which Plaintiff complains. For example, the evidence indicates that Defendant Naber was not a decisionmaker in the hiring of the Chemistry Department Administrative Associate 1 position or the Math Department Administrative Manager position. Moreover, a member of the same protected class as Plaintiff filled the former position, puncturing her ability to establish a *prima facie* case. Assuming that such a *prima facie* case exists in regard to the latter position, Plaintiff's own

evaluation of her interview with Casian indicated a mediocre interview performance, and the successful candidate was evaluated as possessing more relevant skills and experience. Hiring the better candidate is a legitimate, non-discriminatory reason for Plaintiff not obtaining the Math Department Administrative Manager position.

In regard to Defendant Salimbene, the Court notes that the November 21, 2005 written reprimand Salimbene issued to Plaintiff does not constitute an adverse employment action in that it failed to effectuate any material change in Plaintiff's working life. *See Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 708 (6th Cir. 2004) (describing nature of adverse employment action versus mere criticism by supervisor); *Howard v. Bd. of Educ. of Memphis City Schools*, 70 F. App'x 272, 281 (6th Cir. 2003) (rejecting reprimand as an adverse employment action because it failed to accompany an adverse employment action such as a demotion or salary reduction). Additionally, even if the written reprimand were an adverse employment action, Salimbene offers a legitimate, nondiscriminatory reason for issuing the reprimand: Plaintiff did not make the required posting for the technician position that Salimbene ordered her to make. Insubordination is a legitimate, nondiscriminatory reason for issuing the reprimand. *Cf. Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 F. App'x 336, 340 (6th Cir. 2001) (holding that "documented insubordination constitutes a legitimate nondiscriminatory reason for . . . firing"); *Thompson v. Olympic Stain Co.*, 841 F.2d 1127, 1988 WL 19178, at *3 (6th Cir. 1988) (unpublished table decision) (identifying insubordination and disrespectful conduct as legitimate, nondiscriminatory reasons for discharging employee). Finally, Plaintiff's assertion that the negative job reference that she received from Salimbene also fails to survive summary judgment because Plaintiff has failed to show that other similarly situated employees received help from Salimbene finding

jobs. *See Daniels v. Washington Group Int'l*, No. 5:06CV00213 SWW, 2008 WL 268322, at *3 (E.D. Ark. Jan. 29, 2008) (finding a failure to show discrimination where a plaintiff did not show that similarly situated employees received treatment different from the negative job reference the plaintiff received from the defendant); *see also Thompson v. Sanderson Farms, Inc.*, No. 3:04CV837BN, 2006 WL 2711497, at *8 (S.D. Miss. Sept. 21, 2006).

Similarly, the § 1983 claim against Defendant Weber also fails. Weber was not the decisionmaker involved in Plaintiff's termination, and Weber's involvement with Plaintiff's performance improvement plan at the College of Education and Human Ecology does not present actionable conduct. Placement on a performance improvement plan such as the plan involved here was not an adverse employment action. *Novotny v. Elsevier*, 291 F. App'x 698, 703 (6th Cir. 2008); *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002). *See also Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594-95 (6th Cir. 2007) (noting that characteristics and effects of performance improvement plan determine whether it is an adverse employment action). Further, given that her job duties were reassigned to two other existing employees, Plaintiff has failed to demonstrate that she was either replaced by someone outside the protected class or treated differently than similarly situated, non-protected employees. *See Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 895 (6th Cir. 1997) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1564 (6th Cir. 1990))). Plaintiff has also failed to demonstrate, similar to her claim against Salimbene, that any arguably negative job

reference Weber gave concerning Plaintiff differed from those given regarding other similarly situated employees outside the protected class. *See Daniels*, 2008 WL 268322, at *3; *Thompson*, 2006 WL 2711497, at *8.

Finally, in regard to Defendant Neff, Plaintiff has failed to present a genuine issue of material fact precluding summary judgment in his favor. The Court has already discussed and found wanting Plaintiff's reliance on the performance improvement plan with which Weber and Neff were involved. Although there is arguably some debate over whether Neff was Plaintiff's sole supervisor, there is no material debate over whether Neff was at least a supervisor of Plaintiff. In any event, given the dearth of evidence regarding Carolyn Vesely, Plaintiff has failed to produce evidence that Neff treated any similarly situated employee outside the protected class more favorably than he treated Plaintiff. Moreover, Neff has offered multiple legitimate and nondiscriminatory reasons for discharging Plaintiff. In addition to the problems with the reports that Plaintiff eventually generated, Plaintiff had failed to pay the Concourse Hotel and the cleaning service as required. There is also no evidence that Neff knew that Plaintiff had created a key system as required, if indeed she did create such a system.

Plaintiff responds to the foregoing reasons for her failure to obtain the various positions for which she applied by stating the following:

> Defendants have articulated reasons as to why other candidates were selected for positions sought by Kyle-Eiland, all of which–when combined with the record–raise a reasonable inference of incredibility and mendacity with respect to its explanations and motives. The possibilities that an employee with a record such as the Plaintiff's could apply for so many positions, and, specifically, be highly considered until references are provided by Weber and/or Salimbene.

(Doc. # 48, at 41.) Neither sentence salvages Plaintiff's § 1983 race discrimination claims.

The first quoted sentence is a general conclusion that fails to present the analytic path

16

allegedly leading to that conclusion. Such a general reference to the record is insufficient to evade summary judgment given that "[a] district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claims." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)). Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Gover v. Speedway Super Am., LLC*, 284 F. Supp. 2d 858, 862 (S.D. Ohio 2003); Fed. R. Civ. P. 56(c).

The second quoted sentence is an incomplete thought presented in an incomplete sentence. To the extent that the Court can guess at the meaning intended, the Court rejects the possible contention that Plaintiff may be seeking to argue–that the pretext analysis is simply a numbers game. The fact that Plaintiff applied for many positions and did not get them does not mean that Defendants' proffered reasons have no basis in fact, did not actually motivate the actions, or were insufficient to warrant the actions.

This leaves the issue of whether Plaintiff has demonstrated that the proffered reasons underlying her termination are pretextual. Responding to Neff's reasons as described above, Plaintiff argues that this Court must find pretext because Neff's explanations for her discharge have shifted over time.

It is important to note that Neff has offered multiple explanations for the treatment Plaintiff received and not just one reason replacing another. This Court has previously addressed

the issue of what occurs when a defendant offers more than one reason for an adverse

employment action, stating:

> Defendant directs this Court to case law holding that when an employer offers multiple reasons for discharging a plaintiff, that plaintiff must show that each reason was pretextual.  *See, e.g., Bojd v. Golder Associates, Inc.*, No. 06-12209, 2006 WL 3780645, at *1 (11th Cir. Dec. 26, 2006) (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000)).  As Defendant notes, the Seventh Circuit has generally agreed with this approach.  *See Perkins v. G.E. Capital Auto Financial Services, Inc.*, 6 Fed. Appx. 320 (7th Cir. 2001) ("If an employer offers multiple reasons for its adverse employment decision, the plaintiff must demonstrate that each reason is pretextual in order to survive summary judgment.").  But the Seventh Circuit has also recognized that "there may be cases where the multiple reasons offered by the defendant 'are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment' by showing the pretextual nature of just one reason."  *Powell v. Rumsfeld*, 42 Fed. Appx. 856, 860, 2002 WL 1752233, at *3 (7th Cir. July 24, 2002) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995)).  Similarly, the Tenth Circuit has held that discrediting one proffered reason, such as the dominant reason, can cast doubt on all remaining reasons, even if they have not been discredited.  *See Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1127 (10th Cir. 2005).  The Third Circuit has offered a notable explanation for this more measured approach:

>> We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum.  If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder.  That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

> *Fuentes v. Perksie*, 32 F.3d 759, 764-65 n.7 (3d Cir. 1994).  This Court agrees with the approach taken by the majority of courts of appeals that have addressed the issue.

*May v. Pilot Travel Centers LLC*, No. 2:05-cv-918, 2007 WL 108001, at *6 (S.D. Ohio Jan. 5,

2007).  The Court reaffirms its earlier analysis and concludes that Plaintiff has called into doubt

so few, if truly any, of Neff's proffered reasons that the Court cannot conclude that there is an issue as to pretext preventing summary judgment in favor of Neff.

One specific reasons warrants additional comment. In regard to the issue of whether Plaintiff had created a key-control system as required by Neff, the Court notes that there is no evidence that, even if mistaken, Neff did not honestly believe that Plaintiff had failed to create such a system. It is well settled that to establish pretext, a "plaintiff must allege more than a dispute over the facts upon which [the adverse employment action] was based. [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.,* 258 F.3d 488, 493-94 (6th Cir. 2001) (citing *Smith*, 155 F.3d at 806-07). The court of appeals has therefore set forth the essential inquiry for a district court:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

> If there is no material dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.

*Braithwaite*, 258 F.3d at 494 (internal citation omitted) (quoting *Smith*, 155 F.3d at 807). There is no presence here of a material dispute over whether Neff made a reasonably informed and considered decision that demonstrated an honest belief in his proffered reasons for the treatment Plaintiff received. In fact, Plaintiff essentially ignores this issue. Consequently, Neff's proffered

reason stands undisturbed without evidence of discrimination demonstrating pretext.[1]

This leaves for discussion under the Court's § 1983 analysis Defendants' final argument that they are entitled to summary judgment in their individual capacities based on qualified immunity. The qualified immunity doctrine, under certain circumstances, operates to shield from civil liability governmental officials who are performing official duties. *Sinick v. County of Summit*, 76 F. App'x 675, 678-79 (6th Cir. 2003). This affirmative defense is meant to safeguard an official's proper decision making process and offers that party potential relief from frivolous suits. *See D'Agastino v. City of Warren*, 75 F. App'x 990, 993 (6th Cir. 2003). The Sixth Circuit has explained that qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In addition to shielding officials from liability, qualified immunity may entitle the official to not stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). This principal directs courts to make a ruling on the issue of qualified immunity early in the proceedings, so that the costs and expenses of trial are avoided where the defense is dispositive.

---

[1] The pretext inquiry ultimately targets whether evidence of discrimination exists despite an employer's proffered reasons for taking an adverse employment action against an employee. The Court recognizes, as Neff points out in Defendants' briefing, that Neff was the individual who both hired and fired Plaintiff over a relatively brief period of time that included Plaintiff's being off for an extended period on medical leave. The Sixth Circuit has explained that where, as here, the same individual makes the hiring and firing decision, the "same actor inference" may arise because "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle applies regardless of whether the class is age, race, sex, or some other protected classification." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995). The inference is certainly not dispositive of the Court's summary judgment analysis, but is but one additional factor that the Court notes.

*Id.*

The Supreme Court has instructed lower courts to use a distinct analysis to determine whether the application of qualified immunity is warranted. In addressing the potential applicability of qualified immunity, a court follows a sequential inquiry: "First, the court considers whether, on the plaintiff's facts, there has there been a violation. Second, the court considers whether that violation involved 'clearly established constitutional rights of which a reasonable person would have known.' " *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)). *See also Saucier*, 533 U.S. at 201; *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). This analytic approach has also been characterized as a three-part inquiry in which a court must ask:

> 1) has a constitutional violation occurred; 2) was that right a clearly established right of which a reasonable person would have known; and 3) has the plaintiff alleged sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights"?

*Id*. at 679 (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)). *See also Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991) ("A public official is entitled to qualified immunity for conduct in performing discretionary functions so long as that conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known").

The doctrine of qualified immunity thus recognizes that an official can be found to have violated the constitution, but be granted immunity for *reasonable* mistakes as to the legality of his or her action. *Saucier*, 533 U.S. at 206. The reasonableness of such mistakes is inherently dependant upon the clarity of the legal constraints governing particular conduct. The contours of

the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In determining whether a defendant is entitled to qualified immunity, "[t]he ultimate burden of proof is on [the plaintiff] to show that [the defendants] are not entitled to qualified immunity." *Wegener*, 933 F.2d at 392. *See also Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992). Further, "[w]hen ruling on qualified immunity, the district court should indicate the clearly established right at issue and the factual basis for its conclusion that a genuine issue exists as to the commission of acts violating that right." *Wegener*, 933 F.2d at 392 (citing *Poe v. Haydon*, 853 F.2d 418, 423-24, 426 (6th Cir. 1988)).

The Court need not and does not present an extended analysis of Defendants' asserted right to invoke qualified immunity because, assuming arguendo that Defendants have properly invoked the doctrine, it is apparent that Plaintiff cannot prevail on the first prong of the requisite inquiry. As discussed above, Plaintiff cannot demonstrate that there has there been a violation of her equal protection rights here. Accordingly, Plaintiff cannot prevail against Defendants in either their official or individual capacities.

For all of the foregoing reasons, the Court therefore **GRANTS** summary judgment in favor of Defendants on Plaintiff's § 1983 claims.

### 2. *Title VII Claims*

As a threshold issue, Defendants argue that several of Plaintiff's Title VII claims are precluded in this action because she failed to exhaust her administrative remedies or timely file suit. The Sixth Circuit has explained that "[p]rior to . . . bringing suit under Title VII in federal court, a plaintiff alleging discrimination must perform two administrative prerequisites: (1) file

timely charges of employment discrimination with the EEOC, and (2) receive and act upon the EEOC's statutory notice of the right to sue." *Brown v. City of Cleveland*, 294 F. App'x 226, 233 (6th Cir. 2008). *See also Hollimon v. Shebly County Gov't*, No. 08-6035, 2009 WL 1119282, at *3 (6th Cir. Apr. 28, 2009) ("Before bringing a Title VII claim in federal court, a litigant must raise the claim in a discrimination charge filed with the EEOC."). The court of appeals has specifically explained:

> To exhaust administrative remedies, a plaintiff must file an EEOC charge within 180 days of the alleged unlawful employment practice or, if the plaintiff has instituted proceedings with a state or local agency, within 300 days. *See* 42 U.S.C. § 2000e-5(e). Once the EEOC dismisses the charge and issues a right-to-sue letter, the plaintiff has 90 days to file a civil action. *See* 42 U.S.C. § 2000e-5(f)(1).

*Williams v. Northwest Airlines, Inc.*, 53 F. App'x 350, 352 (6th Cir. 2002) (citing *Zipes v. TWA*, 455 U.S. 385, 392-98 (1982)). *See also Marcum v. Oscar Mayer Foods Corp.*, 46 F. App'x 331, 333 (6th Cir. 2002).

Review of the docket reveals that Plaintiff filed the instant lawsuit on August 1, 2007. Previously, she had received a September 11, 2006 right to sue letter (Doc. # 19-22) in connection with her December 12, 2005 charge of discrimination (Doc. # 19-15, at 1). Plaintiff therefore failed to file suit within the 90-day period required by § 2000e-5(f)(1), which precludes her from suing under Title VII over her November 21, 2005 reprimand (Doc. # 19-20) and the alleged discrimination surrounding the events underlying that reprimand. *See Austion v. City of Clarksville*, F. App'x 639, 648-49 (6th Cir. 2007) (holding that Title VII claims asserted in a complaint filed beyond the 90-day filing period are time-barred); *A've v. Serv. Employees Int'l Union*, 24 F. App'x 326, 330 (6th Cir. 2001) (holding that Title VII complaint filed more than 90 days after issuance of right to sue letter was untimely).

There is also no indication in any of Plaintiff's filings of grounds for excusing, or tolling, application of the requirements set forth above. The duty to demonstrate facts supporting tolling falls upon Plaintiff. *Williams*, 53 F. App'x at 352 (citing *Morgan v. Washington Mfg. Co.*, 660 F.2d 710, 712 (6th Cir. 1981)). Even if the Court were to construe Plaintiff's filings as *somehow* implicitly asking for tolling on these specific claims, she has failed to present a sufficient basis for such action here. There is no indication that Plaintiff's failure to follow the statutory mandates is the result of circumstances beyond her control or requirements that are not readily apparent. *See Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998) (setting forth factors to consider in making tolling decision).

Other issues exist surrounding several of Plaintiff's Title VII claims, including her apparent failure to obtain right to sue letters and her flawed assertion of a racially hostile work environment claim as Defendants describe in their briefing. Defendants also assert that Plaintiff has failed to proceed as required in regard to her claims related to her May 16, 2007 discharge. This latter contention presents an unusual situation. Plaintiff asserts that she initiated a charge with the OCRC on May 18, 2007 during a visit to that office. No one disputes that Plaintiff was indeed there, but there is significant disagreement over whether she filed or sought to file a charge. OCRC supervisor Foday Kenneh asserts that he simply met with Plaintiff to answer questions regarding pending charges, while Plaintiff asserts that she believes she initiated a charge that day and that the OCRC and that the OCRC has simply dropped the ball on this charge, resulting in no investigation and no right to sue letter. There are several factual disputes surrounding this scenario, which only grows more problematic the more the details are examined.

The Court need not and does not resolve the filing quagmire that Plaintiff's unusual circumstances present because, even assuming for the sake of argument that all of Plaintiff's claims referenced in the preceding paragraph are properly before this Court via equitable tolling or otherwise, none of her claims can survive summary judgment as discussed below.[2]

Turning to the merits of Plaintiff's claims, the Court begins with Defendants' contention that they are entitled to summary judgment on the Title VII claims asserted against them in their individual capacities. Plaintiff's amended complaint states that each named defendant "is sued individually for damages" and in his or her "official capacity for equitable relief only." (Doc. # 58 ¶¶ 2-5.) The Sixth Circuit has held, however, that "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). *See also Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 n.1 (6th Cir. 2000). Plaintiff has failed to explain how Defendants qualify as employers under Title VII, and this Court can discern no basis for such a characterization. Accordingly, Defendants are entitled to summary judgment on the Title VII claims asserted against them in their individual capacities.

This leaves only Plaintiff's Title VII claims asserted against Defendants in their official

---

[2] The Court recognizes that Plaintiff cannot produce right to sue letters regarding several of her many OCRC/EEOC charges, while the EEOC cannot definitely explain some of its own conduct, such as the confounding September 30, 2008 EEOC letter informing Plaintiff that the United States Department of Justice would process her charge and issue a right to sue letter. (Doc. # 51-2.) Although unusual, entertaining Plaintiff's claims today does not prejudice Defendants (given the outcome of these claims on the merits) and does not prejudice Plaintiff (given that she does not contend that waiting for letters would somehow provide her with an opportunity for additional merits evidence). Thus, the Court errs harmlessly, if at all, by essentially bypassing the Gordian knot that the parties' incomplete recollections and often unexplained conduct have produced. Reaching the merits renders the factual disputes regarding exhaustion immaterial and penalizes neither side.

capacities. The claims fall into three categories: race discrimination, retaliation, and hostile work environment.

The Court can easily dispose of Plaintiff's claim of race discrimination. Title VII provides in pertinent part that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As noted in the prior section, in order to prevail on a race discrimination claim brought under Title VII, Plaintiff must prove the same elements that she would prove while proceeding under § 1983. *Walker*, 241 F. App'x at 265-66 (recognizing that "race discrimination claims . . . under Title VII and . . . under 42 U.S.C. § 1983 are governed by the same substantive standards"); *Smith*, 378 F.3d at 577. Accordingly, Plaintiff's Title VII claims for race discrimination fail for the same reasons that her § 1983 race discrimination claims failed above.

Defendants also seek summary judgment on Plaintiff's claim of retaliation under Title VII, which "prohibits retaliation against an employee 'because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' in connection with an allegedly unlawful employment practice." *Hunter v. Sec'y of U.A. Army*, 565 F.3d 986, 995 (6th Cir. 2009) (citing 42 U.S.C. § 2000e-3(a)). For Plaintiff to prevail on her retaliation claim, she must "prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002); *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000)). A

*prima facie* case requires a plaintiff to show by circumstantial evidence that he or she engaged in protected activity, that the defendant knew of this activity, that the defendant then took an adverse employment action against the plaintiff (or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor), and that there was a causal connection between the protected activity and the adverse employment action or harassment. *Hunter v. Sec'y of U.A. Army*, 565 F.3d at 995-96 (quoting *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)); *Creusere v. Bd. of Educ. of the City Sch. Dist. of the City of Cincinnati*, 88 F. App'x 813, 820 (6th Cir. 2003) (quoting *Morris*). Further, " '[t]he evidence must be sufficient to raise an inference that the protected activity was the likely reason for the adverse action.' " *Creusere*, 88 F. App'x at 820 (citing *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001); *Walborn v. Erie County Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998)).

Given the foregoing and assuming that those retaliation claims that are not time-barred as discussed above are properly before the Court, this Court must nonetheless conclude that Defendants are entitled to summary judgment on Plaintiff's remaining retaliation claims. As noted above, Plaintiff's placement on the performance improvement plan involved here fails to constitute an adverse employment action. *See Novotny*, 291 F. App'x at 703; *Agnew*, 286 F.3d at 310. Placement on the plan therefore cannot constitute retaliation, just as the discrete incidents about which Plaintiff complains (*e.g.*, exclusion from meetings and a reduction in duties) are too trivial to constitute materially adverse actions affecting her job and informing the issue of retaliation. None of these events considered in context would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Sanford v. Main Street Baptists Church*

*Manor, Inc.*, Nos. 07-5869 & 07-5905, 2009 WL 1410994, at *11 (6th Cir. May 20, 2009) ("In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace. The retaliation provision instead protects employees from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008))). Nor can the change in funding Plaintiff experienced suffice to preserve her retaliation claim when she was simply funded the same as other CLEX employees. None of these events are presented with a casual connection to Plaintiff's protected activity.

Additionally, even if the Court were to conclude that Plaintiff has shown a *prima facie* case of retaliation in regard to Neff–and as Neff correctly argues in his briefing, she has not, in no small part because he was unaware of her activity–Plaintiff has nevertheless failed to raise successfully the concern that Neff's proffered reasons were pretextual, for the reasons discussed above in regard to the race discrimination claims. This same line of reasoning similarly undercuts Plaintiff's retaliation claims in regard to the notably numerous positions that she was denied. Assuming *arguendo* that all of these claims are properly before the Court, Defendants have correctly argued that Plaintiff has failed to produce evidence that the relevant decisionmakers knew at the time they made their decisions that she had engaged in protected activity. Plaintiff has also failed to point to even a genuine issue of material fact suggesting that there could be a casual connection between the protected activities and the numerous denials. There is simply a dearth of evidence before this Court suggesting retaliation.

This leaves Plaintiff's last Title VII claim, her harassment/hostile work environment claim. To prove discrimination in the form of a hostile work environment, Plaintiff must show that

> (1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 560-61 (6th Cir. 1999) (discussing the requirements for proving a hostile work environment claim based upon gender); *Moore v. KUKA Welding Sys. & Robot. Corp.,* 171 F.3d 1073, 1078-79 (6th Cir. 1999) (setting forth the elements of a prima facie case for a claim of a hostile work environment based upon race).

*Howard*, 70 F. App'x at 281 (citing *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 604-05 (6th Cir. 2002)). The Sixth Circuit has further explained that a Title VII plaintiff must show that

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter*, 59 F. App'x 678, 681 (6th Cir. 2003) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-23 (1993)) (internal quotes and citations omitted); *see also Howard*, 70 F. App'x at 282.

As discussed above, there is no evidence in this record that the treatment Plaintiff received was based on her race. Consequently, Plaintiff cannot satisfy the fundamental requirement of a Title VII hostile work environment claim. Moreover, the distinct incidents about which Plaintiff complains are so discrete that they could hardly be regarded under the

totality of the circumstances as permeating the workplace with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to affect Plaintiff as she claims to have been affected.[3]  As Defendants note, Plaintiff's conduct in fact suggests not trauma in the workplace, but an ongoing effort to continue relationships, such as that with Salimbene.

### III.  Conclusion

For the reasons stated herein, the Court **GRANTS** Defendants' motion for summary judgment.  (Doc. # 67.)  The Clerk shall enter judgment accordingly and terminate this case upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division, at Columbus.

**IT IS SO ORDERED**.

_____/s/ Gregory L. Frost_____
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE

---

[3]  The Court notes Defendants' contention that the analysis of *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008), may apply to this case.  For the reasons discussed herein, Plaintiff has also failed to present an issue of fact as to whether Defendants' conduct was "sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 347.